**[J-58AB-2019]**
IN THE SUPREME COURT OF PENNSYLVANIA
EASTERN DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 765 CAP |
| | : | |
| Appellant | : | Appeal from the Order entered on |
| v. | : | February 2, 2018 in the Court of |
| | : | Common Pleas, Cumberland County, |
| | : | Criminal Division, at No CP-21-CR- |
| WILLIAM HOWARD HOUSMAN, | : | 0000246-2001 granting a new penalty |
| | : | phase. |
| Appellee | : | |
| | : | SUBMITTED: June 13, 2019 |
| | : | |

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 766 CAP |
| | : | |
| Appellee | : | Appeal from the Order entered on |
| | : | February 2, 2018 in the Court of |
| v. | : | Common Pleas, Cumberland County, |
| | : | Criminal Division, at No CP-21-CR- |
| | : | 0000246-2001 granting a new penalty |
| WILLIAM HOWARD HOUSMAN, | : | phase. |
| | : | |
| Appellant | : | SUBMITTED: June 13, 2019 |
| | : | |

**OPINION**

**JUSTICE TODD**                                   **DECIDED: March 26, 2020**

Before our Court in this capital case are the cross-appeals of the Commonwealth, which has been designated as the appellant in this matter, and William H. Housman, designated as the appellee, from the order of the Cumberland County Court of Common Pleas granting Housman's petition for relief under the Post Conviction Relief Act

("PCRA"), 42 Pa.C.S. §§ 9541 *et seq.*, in the form of a new penalty trial, but denying him guilt phase relief.[1]  After careful review, we affirm.

## I. BACKGROUND

This case arises from the October 2000 murder of Leslie White, the facts of which were summarized by this Court on Housman's direct appeal:

> Shortly after graduating from high school, Leslie White, the victim, met [Housman] when she began working at the Wal-Mart photo shop in Mechanicsburg, Cumberland County. They began a romantic relationship; however, [Housman] was already involved in a romantic relationship with co-defendant Beth Ann Markman, and had been living with her for nearly two years.
>
> Markman discovered e-mails between White and [Housman], revealing their affair. Markman told [Housman] to end his relationship with White, and told several friends and co-workers she intended to "'kick [White's] ass.'"  Markman's co-workers noticed bruising around her eyes and neck, which she attributed to fights with [Housman] over the e-mails.  On one occasion, Markman called Wal-Mart to speak with White, which left White scared and crying.  Markman also visited the store once, looking for White, but left without incident. Markman told a friend "if she ever got her hands on [White], she was going to kill her."  She told her probation officer, Nicole Gutshall, she caught [Housman] cheating on her, and if she caught him cheating again, she would kill the girl.
>
> [Housman] did not terminate his relationship with White. [Housman] and Markman made plans to move to Virginia for a fresh start.  However, Markman became suspicious that [Housman] had not ended his relationship with White. Markman drove [Housman] in her car to a local Sheetz store, where [Housman] used a pay phone to call White at Wal-Mart. He falsely told White his father died, and asked her to come to console him.  He told her Markman was out of town. Various Wal-Mart employees testified White received this call from

---

[1] In capital cases, this Court has exclusive appellate jurisdiction over orders finally disposing of petitions for relief pursuant to the PCRA.  *See* 42 Pa.C.S. §§ 722(4); 9546(d); *Commonwealth v. Williams*, 936 A.2d 12, 17 n.13 (Pa. 2007).

[Housman], and she told her co-workers [Housman's] father died and she was leaving work early to console him.

When White arrived at the trailer where [Housman] and Markman lived, [Housman] talked with her in the living room, while Markman hid in the bedroom until, according to [Markman's] subsequent confession and trial testimony, she heard a thump and White cried out because [Housman] hit her hand with a hammer. Then [Housman] and Markman subdued White and tied her hands and feet with speaker wire, shoved a large piece of red cloth in her mouth, and used another piece of cloth to tie a tight gag around her mouth. With White bound, Markman and [Housman] stepped outside to smoke cigarettes and discuss their next move. Upon reentering the trailer, Markman held White down while [Housman] strangled her with speaker wire and the crook of his arm, killing her. During the struggle, White scratched Markman's neck. White died of asphyxiation caused by strangulation and the rag stuffed into her mouth.

After White died, Markman wrapped White's body in a tent and placed it in the back of White's Jeep. The couple then fled to Virginia. Markman drove her car and [Housman] drove White's Jeep − carrying White's body. In Virginia, they drove to a remote piece of land owned by [Housman's] mother, then placed White's body in the trunk of an abandoned car. They discarded White's personal effects, except for her camera, which they intended to sell.

[Housman] and Markman remained in Virginia for several days, staying with friends and [Housman's] father. [Housman] continued to drive White's Jeep, which he held out as his own. While staying with Larry Overstreet and Kimberly Stultz, Markman corroborated [Housman's] story that they bought the Jeep from Markman's friend in Pennsylvania. At the Overstreet residence, Markman retrieved White's camera from the Jeep and they all took pictures of each other − Markman stated she bought the camera from the same woman who sold them the Jeep. Overstreet and Stultz recalled seeing scratches on Markman's neck, which Markman explained were from a dog. Stultz gave Markman the phone number of a pawn shop, and the shop owner testified he gave Markman $90 and a pawn ticket for the camera. Markman asked Stultz for cleaning supplies because "the Jeep smelled bad, like somebody had a dead animal in [it]." Markman also told Stultz that [Housman] had been

seeing another woman, and if she ever met this other woman, she would "whoop her ass." Another friend, Nina Jo Fields, testified that during the couple's visit to her home, Markman told her [Housman] had been cheating on her, but that she "[didn't] have to worry about the damn bitch anymore, [because she] took care of it."

After White's parents filed a missing persons report, the authorities tracked her Jeep to Housman's location in Virginia. Deputy Brian Vaughan of the Franklin County Sheriff's office in Virginia went to the house to question [Housman] and Markman about the Jeep and White's whereabouts. When he saw the Jeep in the driveway, he ran the license plate number, which traced back to the Toyota Leasing Corporation.

Markman and [Housman] came to the door to greet Deputy Vaughan. Deputy Vaughan questioned them separately in his patrol car about the Jeep. [Housman], who was questioned first, told Deputy Vaughan he called White to ask her to console him about his dog, which had just died. [Housman] said White never arrived at the trailer, and he subsequently left with Markman for Virginia. He claimed a friend loaned him the Jeep.

Subsequently, Markman voluntarily entered the patrol car and explained to Deputy Vaughan she had only seen White once, but had had several phone conversations with her. She denied knowledge of White's whereabouts, but indicated White had a bad relationship with her parents, suggesting she had run away. Markman denied knowing how [Housman] acquired the Jeep, and admitted driving separate cars to Virginia. When Deputy Vaughan asked Markman if she was afraid of [Housman], she said she was not; rather, she admitted she had a violent temper, and [Housman] often had to restrain her from attacking him. She said she provoked [Housman] in the past and had thrown things at him, but [Housman] never assaulted or threatened her.

Following the police visit, [Housman] and Markman drove back to the property where they left White's body; there they abandoned the Jeep. Despite the couple's efforts to conceal the evidence, the police soon discovered the Jeep, as well as White's partially-decomposed body in the trunk of the abandoned car − the body was still bound, gagged, and wrapped in the canvas tent. [Housman]'s fingerprints were found on the car's trunk lid and license plate, a compact disc

recovered from the Jeep, the Jeep's hatch, and other evidence recovered from the scene. Markman's fingerprints were found on a potato chip bag retrieved from the Jeep, and the Jeep's passenger door and rear hatch. Subsequent analysis revealed Markman's DNA under White's fingernails.

The Pennsylvania State Police obtained a search warrant for Markman's trailer and executed it; they found blood on a pillow and urine on the carpet in the place White was likely strangled. Police also discovered two lengths of speaker wire, red fibers on the floor, a piece of red cloth, a steak knife, red fibers on the knife, a tent storage bag, a hammer, and a stethoscope. Police arrested [Housman] and Markman on October 11, 2000, exactly one week after the murder. Police retrieved White's camera from the pawn shop and developed the film. The pictures taken at the Overstreet residence were admitted into evidence at trial; in one photograph − taken just days after [Housman] and Markman strangled White to death − Markman is laughing while [Housman] pretends to strangle her.

Following their arrest, and after receiving *Miranda* warnings, Markman and [Housman] waived their rights and agreed to be interviewed, providing tape-recorded statements. Each independently confessed to participating in White's murder. [Housman] admitted to killing White by strangling her, but claimed Markman instigated the murder to eliminate the source of one of their relationship problems and enable them to start their relationship anew. He maintained Markman directed him to tie White up and strangle her, and Markman forced compliance by hitting him with a hammer and then spinning the hammer in a threatening manner. After White died, Markman listened with a stethoscope to verify her death before wrapping the body in the tent.

In her police statement, Markman admitted she bound and gagged White and held her down while [Housman] strangled her. She insisted, however, [Housman] devised the plan to murder White in order to steal her Jeep, and he coerced her assistance by threatening to kill her with a hunting knife if she did not obey him. Markman also asserted [Housman] wore down her resistance by terrorizing her the night before the murder by holding a knife to her throat and forcing her to remain naked in the trailer. Markman said she only realized White was dead when White lost control of her bladder.

[Housman] moved to sever his trial from Markman's because introduction of Markman's confession to police, which was admissible against Markman, would violate his Sixth Amendment right to confront a witness against him. The trial court denied the motion. [Housman] and Markman were tried on one count each of criminal homicide, kidnapping, unlawful restraint, and abuse of a corpse, and two counts of theft by unlawful taking or disposition (pertaining to the Jeep and the camera), as well as conspiracy as to all of these offenses.

[Housman] and Markman each decided to advance a duress defense, trying to show they engaged in the conduct charged because they were coerced by the other through "the use of, or a threat to use, unlawful force against his person or the person of another, which a person of reasonable firmness in his situation would have been unable to resist." 18 Pa.C.S. § 309(a). Upon learning Markman intended to show she acted under duress as the result of [Housman's] abuse, [Housman] filed a motion for reconsideration of the severance denial, arguing he would be prejudiced by evidence of his abuse of Markman. The trial court again denied the motion, and the joint trial began.

During the guilt phase, the Commonwealth played an audiotape of Markman's confession, altered so references to [Housman] were replaced with another voice saying "the other person." In her confession, Markman initially denied knowledge of White's murder, or even knowing White had been to her trailer the night she was killed. After being questioned, Markman changed her story and said [Housman] was helping White run away from her parents, and while Markman drove to Virginia in her car, [Housman] drove White to Virginia in White's Jeep. When police asked about the scratches on her neck, Markman changed her story again and said she had gotten into a fight with White the day she left for Virginia. After further interrogation, Markman confessed to her role in the murder, but blamed [Housman] for making her participate by threatening and terrorizing her. Markman said when White arrived at the trailer in response to [Housman]'s phone call, she stayed out of the way until she heard White cry out when [Housman] hit her hand with a hammer. [Housman] then made Markman tie White up, gag her, and blindfold her. Markman said after [Housman] strangled White, he made her wrap White's body in the tent and put it in the Jeep. When asked why [Housman] killed White, Markman responded she believed he wanted the Jeep.

Markman was permitted to adduce evidence of abuse by [Housman] in her defense. Markman testified [Housman] physically abused her during their relationship, particularly in the months before the murder. She also alleged [Housman] terrorized her for the two days preceding the murder, during which time he cut her clothes off with a knife, repeatedly raped her, and threatened her if she did not do as he instructed.

Markman's testimony also included details of the night of the murder. Markman claimed that when she drove [Housman] to the gas station, she did not know he was planning to call White, and she attempted to escape once they returned to the trailer; however, [Housman] violently prevented her from leaving. Markman stated even when White was bound and gagged, she did not know [Housman] was going to kill her, and she was in the kitchen getting White a glass of water when [Housman] strangled her. At that time, Markman testified [Housman] ordered her to return the gag to White's mouth because it had slipped, and she only obeyed him because she was afraid he would kill her, too. As for her statement to Officer Vaughan that [Housman] had never abused her, she said she was trying to protect him. When questioned about the photograph in which she was laughing while [Housman] pretended to strangle her, Markman stated [Housman] was tickling her.

Based on the evidence of abuse, Markman requested a jury instruction on the defense of duress. The trial court refused because Markman placed herself in a situation where it was probable she would be subjected to duress. . . .

The Commonwealth also introduced a tape of [Housman's] confession, which was redacted so references to Markman were replaced with "the other person" in another voice. Due to an apparent oversight, there were two instances of non-redaction, where [Housman]'s references to Markman by name remained on the tape. The confession alleged Markman conceived of the plot to kill White, directed its execution, and forced [Housman] to cooperate. [Housman] said Markman wanted White dead because she was jealous. He admitted he called White to the trailer because he wanted someone to talk to, and he knew he had to lie to get her to come to the trailer. After [Housman] talked with White for a few minutes, Markman came out of the bedroom, playing with

a hammer. According to his confession, after playing with the hammer, Markman hit him with the hammer "[j]ust enough for me to feel the pain." Markman directed [Housman] to tie White's hands, and once he was finished, she tied [Housman's] hands and White's feet. After blindfolding and gagging White, Markman untied [Housman] and they went outside to smoke a cigarette. While they were outside, according to [Housman's] confession, Markman said if [Housman] loved her, he would do as she told him. When they went back inside, Markman directed [Housman] to pull speaker wire around White's neck, which he did because he did not "want to die that night" in the event Markman "flipped out and wanted to hit me with a . . . hammer." [Housman] confessed to devising the plan to leave the state with White's body so they could hide it on his family's Virginia property . . . .

The trial court informed the jury the taped confessions had been altered at the trial court's direction to include the words "the other person" and they were only to consider the confession as evidence against the defendant that gave the confession. [Housman] did not testify and presented no defense during the guilt phase. He argued he lacked the specific intent to kill White because of Markman's threats and conduct with the hammer, his confession supported a third degree murder conviction, and the crimes not did not involve kidnapping.

*Commonwealth v. Housman*, 986 A.2d 822, 826-30 (Pa. 2009) (internal citations and footnotes omitted).

On November 1, 2001, the jury convicted both Housman and Markman of first-degree murder,[2] kidnapping,[3] theft by unlawful taking or disposition,[4] unlawful restraint,[5] abuse of a corpse,[6] and criminal conspiracy.[7] The Commonwealth sought the death penalty for both Housman and Markman. At his penalty phase, Housman presented the testimony of Robin Collins, a spiritual advisor with the Cumberland County Prison; Cheryl

---

[2] 18 Pa.C.S. § 2502(a).
[3] 18 Pa.C.S. § 2901.
[4] 18 Pa.C.S. § 3921.
[5] 18 Pa.C.S. § 2902(a).
[6] 18 Pa.C.S. § 5510.
[7] 18 Pa.C.S. § 903(a).

McElwee Gillespie, Housman's half-sister (Cheryl and Housman shared the same mother, Geneva Housman); and Dr. Stanley Schneider, a psychologist who evaluated Housman and who spoke with several of Housman's family members. The relevant testimony of these individuals is discussed in detail below. Housman also took the stand. On November 5, 2001, the jury found one aggravating circumstance − a killing committed while in the perpetration of a felony, *see* 42 Pa.C.S. § 9711(d)(6) − and two mitigating circumstances − a troubled childhood and acceptance of responsibility under the catch-all mitigator, *see* 42 Pa.C.S. § 9711(e)(8) − and returned a sentence of death.[8]

On December 29, 2009, in an opinion authored by former-Justice Eakin, this Court affirmed Housman's judgment of sentence. *See Housman*, *supra.* Justice Baer authored a dissenting opinion, stating that he would have reversed Housman's conviction and remanded for a new trial due to the trial court's refusal to sever the trials of Housman and Markman. Then-Justice, now-Chief Justice, Saylor authored a concurring and dissenting opinion, indicating that he would affirm Housman's conviction, but would vacate his death sentence and remand for a new sentencing hearing. Thereafter, Housman sought *certiorari* before the United States Supreme Court, which was denied on October 4, 2010. *See Housman v. Pennsylvania*, 131 S.Ct. 199 (2010) (order).

On June 17, 2011, Housman filed a timely *pro se* petition for relief pursuant to the PCRA. A 187-page amended counseled petition was filed on May 22, 2013. Subsequently, Housman sought to further amend his petition to include constitutional

---

[8] Markman also was sentenced to death, but, on direct appeal, this Court reversed her convictions and remanded for a new trial on the murder, kidnapping, and unlawful restraint charges, finding (1) that introduction of Housman's erroneously redacted confession violated Markman's confrontation rights under *Bruton v. United States,* 391 U.S. 123 (1968), and *Gray v. Maryland,* 523 U.S. 185 (1998); and (2) that the jury should have been informed of the elements of the defense of duress. *See Commonwealth v. Markman,* 916 A.2d 586 (Pa. 2009).

challenges regarding an alleged bias of Justice Eakin, and he also sought recusal of the entire Cumberland County Court of Common Pleas bench. Housman's motion to amend his PCRA petition was denied,[9] but his motion for recusal was granted, and, ultimately, following three days of evidentiary hearings and several extensions, the PCRA court, by the Honorable Linda K.M. Ludgate of the Berks County Court of Common Pleas, granted Housman a new penalty trial, concluding that he established that trial counsel was ineffective for failing to "investigate, develop and present compelling mitigation evidence." PCRA Court Opinion, 2/2/18, at 10. The PCRA court further held that "the improper arguments and victim impact testimony challenged [by Housman], when taken cumulatively with [the mitigating evidence claim], support the finding of ineffectiveness and the granting of a new penalty phase." *Id.* at 10-11. The PCRA court determined that Housman's remaining claims were either previously litigated or without merit; thus, it denied Housman's request for a new guilt trial. The Commonwealth appealed the PCRA court's grant of a new penalty-phase trial, and Housman cross-appealed the court's denial of guilt-phase relief.

## II. ANALYSIS

In reviewing the grant or denial of PCRA relief, an appellate court considers whether the PCRA court's conclusions are supported by the record and free of legal error. *Commonwealth v. Crispell,* 193 A.3d 919, 927 (Pa. 2018). Moreover, the factual findings of a post-conviction court, which hears evidence and passes on the credibility of witnesses, should be given deference. *See Commonwealth v. Spotz,* 84 A.3d 312, 319 (Pa. 2014).

In order to qualify for relief under the PCRA, a petitioner must establish, by a preponderance of the evidence, that his conviction or sentence resulted from one or more

---

[9] Housman does not presently challenge the denial of his motion to amend his PCRA petition.

of the enumerated errors in 42 Pa.C.S. § 9543(a)(2). These errors include, *inter alia*, a violation of the Pennsylvania or United States Constitutions, or instances of ineffectiveness of counsel that "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." *Id.* § 9543(a)(2)(i) and (ii); *Crispell*, 193 A.3d at 927. A petitioner also must establish that his claims have not been previously litigated or waived. 42 Pa.C.S. § 9543(a)(3). An issue is previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue." *Id.* § 9544(a)(2).

Additionally, to obtain relief under the PCRA based on a claim of ineffectiveness of counsel, a PCRA petitioner must satisfy the performance and prejudice test set forth in *Strickland v. Washington,* 466 U.S. 668 (1984). In Pennsylvania, we have applied the *Strickland* test by requiring a petitioner to establish that: (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's action or failure to act; and (3) the petitioner suffered prejudice as a result of counsel's error, with prejudice measured by whether there is a reasonable probability that the result of the proceeding would have been different. *Commonwealth v. Pierce,* 786 A.2d 203, 213 (Pa. 2001). Counsel is presumed to have rendered effective assistance, and, if a claim fails under any required element of the *Strickland* test, the court may dismiss the claim on that basis. *Commonwealth v. Ali,* 10 A.3d 282, 291 (Pa. 2010). We will first address Housman's guilt-phase claims.

## A. Guilt Phase

### 1. Evidence of Prior Bad Acts

Housman asserts that trial counsel was ineffective for failing to object to the admission of evidence of his prior bad acts, bad character, and propensity for violence at the guilt phase of his trial, and, further, that appellate counsel was ineffective in failing to

properly raise this issue on direct appeal. Evidence of prior bad acts is generally inadmissible to prove character or to show conduct in conformity with that character. Pa.R.E. 404(a)(1). Such evidence is permissible, however, when offered to prove other relevant facts, such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or *res gestae* to give context to events surrounding a crime. Pa.R.E. 404(b)(2); *Crispell*, 193 A.3d at 936. Although evidence of prior bad acts may be relevant and admissible, due to the potential for misunderstanding, the defendant is entitled to a jury instruction cautioning that the evidence is admissible only for a limited purpose. *Crispell*, 193 A.3d at 937.

Specifically, Housman challenges the testimony of witnesses who testified on behalf of Markman that Housman was physically, sexually, and verbally abusive toward Markman. Housman concedes that the trial court instructed the jury that this evidence was admissible only for purposes of Markman's duress defense, but notes that the court subsequently disallowed Markman's defense and failed to strike the bad acts evidence from the record. Housman additionally references testimony that he "committed rape;" "possessed child pornography and had sexually explicit relationships with minors;" was "crazy" and "suicidal;" was "lazy and could not hold down a job;" had previously been incarcerated; threatened to kill animals; vandalized the property of others; was a gang member; had the look of "pure evil;" was banned from the trailer park where he lived; committed burglary and theft; and lacked remorse. Housman's Brief at 102. According to Housman, this testimony was irrelevant, inadmissible, and highly prejudicial.

In response to Housman's argument, the Commonwealth notes that the majority of the evidence to which Housman refers was introduced not by the Commonwealth, but

by Markman, in an effort to support her duress defense.[10]  The Commonwealth further argues that, even if certain evidence was improperly admitted, the properly-admitted evidence was so overwhelming that Housman suffered no prejudice.

The PCRA court rejected Housman's claim, observing that the bad acts evidence

> only came in because of the court's refusal to sever the trials. The instances of admitted bad acts were used on [direct] appeal as facts in support of demonstrating the prejudice caused by the court's alleged failure to sever the trials.  But, on the same facts as we have before us concerning this very Claim, the Supreme Court denied relief on [Housman's] due process/fair trial claim which encompassed severance, the

---

[10] Indeed, a review of the transcript reveals that only four of the statements were not introduced during Markman's presentation of a duress defense, and, further, that Housman's characterization of the evidence is inaccurate.  For example, David Wriglesworth, the assistant store manager at the Wal-Mart where White and Housman once worked, was asked whether Housman was terminated from employment, and responded, "[y]es, he was."  N.T. Trial, 10/25/01, at 145.  No witness testified that Housman was "lazy and could not hold down a job," as Housman claims.  Another witness, Joshua Kerstetter, a part-time employee at the Wal-Mart, described the day when White left work after she had received a call from Housman telling her his father had died. Kerstetter stated that White "was concerned that [Housman] was actually going to do harm to himself because he was so distraught over his father being dead."  *Id.* at 149.  There was no reference to Housman being "crazy."

Regarding evidence of Housman's prior incarceration, page 434 of the notes of testimony from October 26, 2001 reflects a discussion between the court and the attorneys regarding scheduling issues and a tape recording, but no reference to Housman having been previously incarcerated, as Housman claims.

Finally, Housman asserts that the Commonwealth introduced evidence that he lacked remorse, citing to page 313 of the transcript of October 26, 2001.  Housman's Brief at 107.  However, the only statement on that page pertaining to Housman's demeanor was a statement by Deputy Brian Vaughan, who, in response to the Commonwealth's questioning, indicated that Markman, at the time of arrest, "appeared to be hyperventilating, having trouble catching her breath," while Housman "wasn't having any such trouble."  Housman, however, argues that the prosecutor utilized this statement to argue during his closing argument that Housman's subsequent showing of remorse was contrived because he had not shown remorse earlier. Appellant's Brief at 107.  A review of the portion of the closing argument cited by Housman, however, does not reveal any statement regarding Housman's demeanor at the time of arrest, or suggestion that his demeanor at that time demonstrated a lack of remorse.  *See* N.T. Trial, 11/1/01, at 148-49.

admitted bad acts evidence and the hearsay presented at trial
through co-defendant's Markman's defense.

PCRA Court Opinion, 2/2/18, at 18.

We agree that Housman's ineffectiveness claim fails because, even if the aforementioned evidence was improperly admitted, he has failed to demonstrate prejudice. As noted, on direct appeal, Housman argued that one of the reasons his trial should have been severed from Markman's was because her duress defense permitted her to present substantial prejudicial evidence of uncharged conduct by Housman. In rejecting Housman's claim that he was entitled to a new trial due to the trial court's refusal to sever the trials, this Court explained, *inter alia*:

> while the evidence of abuse could have caused the jury to infer appellant was violent, any prejudice was eclipsed by his own admission that he *violently strangled White to death* in his living room after luring her there under false pretenses, drove to Virginia with her lifeless body in her Jeep, and subsequently deposited her body in the trunk of an abandoned car. The jury was aware, based on this evidence alone, of appellant's capacity for violence. Suggestions that he intimidated Markman pale in comparison. Focusing on the possibility of mice, appellant ignores the elephant in the room.
>
> Any prejudice resulting from Markman's admission of evidence of abuse was *de minimis*, and did not overcome the factors weighing in favor of a joint trial, nor did the prejudice outweigh the Commonwealth's overwhelming evidence supporting appellant's first degree murder conviction.

*Housman*, 986 A.3d at 835 (emphasis original).

Although Housman now couches his claim in terms of ineffectiveness, this Court has already concluded that the properly-admitted evidence that Housman lured the victim to his trailer by lying to her, strangled her with speaker wire, and discarded her body in an abandoned car, was sufficient to demonstrate to the jury Housman's capacity for violence and to support his conviction for first-degree murder. We likewise conclude that any prejudice from the admission of evidence of Housman's nonviolent bad acts,

including his alleged possession of child pornography and sexual relationships with minors, did not outweigh the overwhelming and properly-admitted evidence of his guilt. Accordingly, there is no basis to conclude that, had the evidence of Housman's prior bad acts not been admitted, there is a reasonable probability that the result of the proceeding would have been different. For this reason, his ineffectiveness claim fails.

## 2. Hearsay

Housman next argues that his trial counsel was ineffective in failing to object to the admission of "numerous hearsay statements," which he maintains violated his right to confrontation and due process under the United States and Pennsylvania Constitutions. Housman's Brief at 117. Hearsay, defined as an out-of-court statement offered to prove the truth of the matter asserted therein, generally is inadmissible at trial, unless it falls within an exception to the hearsay prohibition. *Commonwealth v. Le*, 208 A.3d 960, 970 (Pa. 2019).

The PCRA court, in denying Housman relief on this claim, noted:

> [Housman] plainly failed to meet his burden due to his lack of specificity as to which instances of hearsay he means to address here. Neither the petition nor memorandum specify exactly how counsel erred or how [Housman] was prejudiced. Instead, [Housman] posits vague claims regarding the hearsay allegedly introduced at trial. He states that trial counsel failed to object to "<u>some</u>" of the hearsay and that appellate counsel only raised "<u>some</u>" of the instances where trial counsel failed to object to such hearsay. We cannot address a generalized presentation of such a fact-intensive claim.

PCRA Court Opinion, 2/2/18, at 17 (emphasis original).

In his brief to this Court, Housman identifies a single statement which he contends was improper hearsay and to which trial counsel should have objected. Specifically, he quotes the following exchange between the prosecutor and Melissa Martin, a Wal-Mart employee, who recounted her conversation with the assistant manager, Chad

Wriglesworth, after White requested permission to leave work early after receiving a telephone call from Housman:

> **Prosecutor**: Now, after that inquiry, what happened there at work after that? Did you make an inquiry about Will Housman?
>
> **Martin**: Yes. Chad and I discussed what was happening, what Leslie [White] had said to him.
>
> **Prosecutor**: Okay. And what was that?
>
> **Martin**: He -- Chad told me that Leslie said that Will had just called, his father had died, and that she wanted to go be with him.
>
> **Prosecutor**: So it was Will had just called, his father had died, Leslie wanted to be with him?
>
> **Martin**: Correct.

N.T. Trial, 10/25/01, at 103.

Housman asserts that the above statement constituted "highly prejudicial triple hearsay, which supported the Commonwealth's theory that Housman lured the victim to his home under false pretenses." Housman's Brief at 119. He further claims that "[t]he Commonwealth's witnesses and Markman's witnesses repeatedly testified about alleged altercations between Housman and Markman that these witnesses never actually observed," and, in a footnote, directs this Court's attention to "Claim 7 of the PCRA petition," *id.* at 120, for a "lengthy discussion of each piece of inadmissible hearsay evidence that was introduced at Mr. Housman's trial." *Id.* at n.38.

Regarding Housman's citation to his PCRA petition, we have previously held that "incorporation by reference" is an "unacceptable manner of appellate advocacy for the proper presentation of a claim for relief to our Court." *Commonwealth v. Briggs*, 12 A.3d 291, 342 (Pa. 2011); *see also Commonwealth v. Edmiston,* 634 A.2d 1078, 1092 n.3 (Pa.

1993) (specifying that all claims a litigant desires this Court to consider must be set forth in the appellate brief and not just incorporated by reference). Rather,

> [o]ur rules of appellate procedure specifically require a party to set forth in his or her brief, in relation to the points of his argument or arguments, "discussion and citation of authorities as are deemed pertinent," as well as citations to statutes and opinions of appellate courts and "the principle for which they are cited." Pa.R.A.P. 2119(a), (b). Therefore our appellate rules do not allow incorporation by reference of arguments contained in briefs filed with other tribunals, or briefs attached as appendices, as a substitute for the proper presentation of arguments in the body of the appellate brief. Were we to countenance such incorporation by reference as an acceptable manner for a litigant to present an argument to an appellate court of this Commonwealth, this would enable wholesale circumvention of our appellate rules which set forth the fundamental requirements every appellate brief must meet. *See, e.g.,* Pa.R.A.P. 2135(a)(1) (establishing length of principal brief at no greater than 70 pages); *Commonwealth v. (James) Lambert,* 568 Pa. 346, 356 n.4, 797 A.2d 232, 237 n.4 (2001) (Opinion Announcing Judgment of the Court) (refusing to consider claims not argued in the brief but incorporated by reference from motions made at trial and observing that "[t]o permit appellant to incorporate by reference his previous motions would effectively allow him to more than double the original briefing limit."). The briefing requirements scrupulously delineated in our appellate rules are not mere trifling matters of stylistic preference; rather, they represent a studied determination by our Court and its rules committee of the most efficacious manner by which appellate review may be conducted so that a litigant's right to judicial review as guaranteed by Article V, Section 9 of our Commonwealth's Constitution may be properly exercised. Thus, we reiterate that compliance with these rules by appellate advocates who have any business before our Court is mandatory.

*Briggs,* 12 A.3d at 343 (footnotes omitted).

Housman has failed to develop or present a proper argument with respect to all but a single claim of hearsay, so we find his claims regarding those unidentified instances

to be waived.[11]   With respect to the one instance of alleged hearsay identified by Housman in his brief − Martin's testimony regarding the conversation she had with Wal-Mart Assistant Manager Wriglesworth about Housman's telephone call to White − we reject Housman's claim that trial counsel was ineffective for failing to object to this statement.   The alleged hearsay statement was cumulative of Housman's own confession, wherein he admitted to calling White for the purpose of luring her to his trailer. *See* Housman's *Brief in Support of Postsentence Motions*, 3/19/02 (PCRA Hearing Exhibit 24), at 6 ("Mr. Housman explained that he called Ms. White and lied to her about his father's death because he needed someone to talk to and 'I knew she wouldn't come over so I told her dad died.'").   Thus, counsel had a reasonable basis for not objecting to the statement, and, accordingly, Housman's claim that he is entitled to a new trial because trial counsel was ineffective for failing to object to the statements fails.

### 3.  Trial court's refusal to sever trials

Housman next contends that his appellate counsel was ineffective in failing to properly raise and litigate a claim that Housman's right to due process and a fair trial were violated when the trial court refused to sever the guilt phase of his trial from that of his co-defendant Markman, thereby allowing highly prejudicial evidence, including prior bad acts, bad character, and hearsay, to be introduced into evidence.   Housman acknowledges that trial counsel raised and preserved this issue as a claim under the United States and Pennsylvania Constitutions, and, further, that his appellate counsel raised the issue on direct appeal.   He maintains, however, that appellate counsel was ineffective "for failing to raise it as a federal due process claim and failing to raise specific factual and legal grounds supporting this claim."   Housman's Brief at 125.

---

[11] We recognize that, in its brief, the Commonwealth addresses several alleged hearsay statements beyond the one specifically identified by Housman in his brief.  This, however, does not alter this Court's prohibition against incorporation by reference.

In response, the Commonwealth contends that Housman fails to demonstrate arguable merit or prejudice with respect to this claim. It first observes that, notwithstanding the fact that appellate counsel did not specifically cite federal due process principles on direct appeal, the foundation of Housman's federal due process claim was substantively rejected by this Court on direct appeal, wherein this Court, in rejecting his state claim, relied extensively on *Commonwealth v. Chester*, 587 A.2d 1367 (Pa. 1991), which, in turn, relied on federal precedent. Noting that "the test for prejudice in the ineffectiveness context is more exacting than the test for harmless error," the Commonwealth further argues that, in light of this Court's determination that any error by the trial court in failing to sever Housman's case from Markman's was harmless, Housman failed to meet his burden that he was prejudiced by appellate counsel's alleged ineffectiveness. Commonwealth's Reply Brief at 36-37 (citing *Commonwealth v. Spotz*, 84 A.3d 294, 315 (Pa. 2014) (observing that, in order for an error to be deemed harmless, the Commonwealth must establish, beyond a reasonable doubt, that the error did not contribute the verdict, whereas, in order to establish actual prejudice in connection with an ineffectiveness claim, the defendant must demonstrate that the ineffectiveness had an actual adverse effect on the outcome of the proceedings)).

The PCRA court rejected Housman's claim, noting that, while now couched as an ineffectiveness claim, it rests on the same facts upon which this Court denied the claim on direct appeal. PCRA Court Opinion, 2/2/18, at 15. The court further reasoned that, even if appellate counsel was unreasonable in failing to present the additional arguments offered by Housman, Housman failed to demonstrate that there was a reasonable probability that the additional arguments would have resulted in a different outcome. *Id.* at 16.

We agree with the PCRA court that Housman's refashioned severance claim does not afford him relief. This Court addressed a similar claim by the defendant in *Commonwealth v. Elliott*, 80 A.3d 415 (Pa. 2013). In that case, the defendant argued that, although appellate counsel unsuccessfully challenged the admissibility of bad acts evidence on direct appeal, counsel was ineffective for failing to raise the distinct contention that the admission of bad acts evidence violated his federal constitutional right to due process. The PCRA court in *Elliott* determined that the issue had been previously litigated on direct appeal and, therefore, was not cognizable under the PCRA. This Court concluded that the PCRA's court's finding that the issue had been previously litigated was erroneous, as a Sixth Amendment claim of ineffectiveness raises a distinct legal ground for purposes of state PCRA review from the underlying claim of trial court error. *See Commonwealth v. Collins*, 999 A.2d 564, 573 (Pa. 2005).

Nevertheless, we concluded that Elliott's ineffectiveness claim lacked arguable merit, as the foundation of the underlying federal due process claim was that the evidence was irrelevant and unduly prejudicial, an argument this Court had rejected on direct appeal. *See Elliott*, 80 A.3d at 442. Housman's underlying federal due process claim is based on the argument that the trial court's refusal to sever his trial from Markman's unduly prejudiced him by permitting evidence of his prior bad acts and bad character to be used against him. However, this Court previously rejected this identical argument on direct appeal, concluding that any prejudice that resulted from the admission of such evidence was *de minimis*, and was eclipsed by his own admissions. *See Housman*, 986 A.2d at 835. Thus, consistent with *Elliott*, Housman has failed to demonstrate the arguable merit prong of his current ineffectiveness claim, and he is not entitled to relief.

## 4. Jury charge on accomplice liability and conspiracy

Housman next argues that trial counsel was ineffective for failing to object to the trial court's charge on accomplice liability and conspiracy because the charge did not advise the jury that it had to make a finding that Housman had a specific intent to kill in order to convict him as an accomplice to first-degree murder. Housman contends that the jury charge, as given, eliminated the Commonwealth's burden of proof as to a crucial element of the offense, violating his due process rights.

In support of his argument, Housman quotes the following portion of the jury charge on accomplice liability given by the trial court:

> I say, as a general rule, you may find a defendant guilty of a crime without finding that he or she personally engaged in the conduct required for the commission of the crime. A defendant is guilty of a crime if he or she is an accomplice of another person who commits that crime.
>
> A defendant does not become an accomplice merely by being present at the scene or knowing about the crime. He or she is an accomplice if, with the intent of promoting or facilitating commission of the crime, he or she solicits, commands, requests, encourages or agrees with the other person in planning or committing it.
>
> You may find a defendant guilty of a crime on the theory that the defendant was an accomplice so long as you are satisfied beyond a reasonable doubt that the crime was committed and that the defendant was an accomplice of the person who committed it.

N.T. Trial, 11/1/01, at 1209-10.

Housman suggests that the above charge was substantially similar to the charge deemed to violate due process by the Third Circuit in *Laird v. Horn*, 414 F.3d 419, 425 (3d Cir. 2005) ("Under Pennsylvania law, first-degree murder requires the specific intent to kill, and that *mens rea* is also required of accomplices and co-conspirators."). Housman further notes that this Court already determined, in his co-defendant's appeal, that the

accomplice liability charge given by the trial court was erroneous. *See Markman*, 916 A.2d at 597 n.8 ("Here, the trial judge gave the jury a general accomplice liability instruction, but did not explain that the defendant must personally have had a specific intent to kill to be convicted of first degree murder as an accomplice. While this omission constituted error under the *Bachert*/*Huffman*[12] rule . . . the error is irrelevant for purposes of a sufficiency analysis and, moreover, the parties have not raised the issue.").

Housman additionally challenges the trial court's conspiracy charge to the jury, which provided:

> For purposes of this case, the defendants are charged with conspiracy on homicide, kidnapping, theft, unlawful restraint and abuse of corpse. I just gave you the elements of those charges.
>
> In order to find the defendants guilty of conspiracy to commit these charges, you must be satisfied initially that the following two elements of a conspiracy have been proven beyond a reasonable doubt:
>
> One, that the defendants agreed with one another that they or one or more of them would engage in conduct which constitutes a crime of homicide as I have described it or kidnapping or theft or unlawful restraint or abuse of [a] corpse, or agreed to aid another person or persons in the planning and/or commission of the crimes as I have outlined them to you. And, second, that the defendant or defendants did so with the intent of promoting or facilitating commission of these other crimes.
>
> In other words, the defendants shared the intention to bring about the crime *or to make it easier to commit all these crimes.*

---

[12] In *Commonwealth v. Huffman,* 638 A.2d 961 (Pa. 1994), this Court found reversible error where the trial court's instruction suggested that the jury could find that the defendant possessed the specific intent to kill required for a first-degree murder conviction based solely on an act of his accomplice. We clarified that the Commonwealth must prove beyond a reasonable doubt that the defendant independently possessed the requisite specific intent to kill, and that the same could not be proven by evidence of the intent to kill possessed by the defendant's accomplice or co-conspirator.

> No person may be convicted of conspiracy unless an overt act is done in pursuance of the conspiracy -- unless an overt act is alleged and proven to have been done by the defendant or the co-defendant, co-conspirator.
>
> In this case, it is alleged that the following were overt acts: Luring Leslie White to 112 Big Spring Terrace in Newville, blindfolding, gagging, tying the hands and feet of Leslie White, strangling Leslie White, stealing White's vehicle and camera and using this property as their own, transporting White's body to Floyd County, Virginia, in the rear of her Jeep and placing White's body in the trunk of an abandoned car on the abandoned property that you heard, such as her whereabouts were unknown.
>
> Thus, you cannot find the defendants guilty unless, in addition to the elements of conspiracy, you are satisfied beyond a reasonable doubt that one of the defendants did at least one of the alleged overt acts in pursuance of the conspiracy.

N.T. Trial, 11/1/01, at 1221-22 (emphasis added). Housman maintains that the inclusion of the above-italicized phrase "or to make it easier to commit all these crimes" in the trial court's conspiracy charge relieved the Commonwealth of its burden of proving that he had the specific intent to kill.

The PCRA court rejected Housman's claims of ineffectiveness based on the trial court's jury instructions on accomplice liability and conspiracy, noting that *Laird*, the case on which Housman relies, was decided years after the jury instruction was given in the instant case, and holding that counsel cannot be deemed ineffective for failing to predict a change in the law. PCRA Court Opinion, 2/2/18, at 17.

The Commonwealth asserts that Housman ignores the more recent controlling case law of this Court, including *Commonwealth v. Daniels,* 963 A.2d 409 (Pa. 2009), wherein we held that the PCRA petitioner was not prejudiced by counsel's failure to challenge the trial court's jury instructions regarding the specific intent to kill required for a conspiracy conviction, even though an isolated portion of the charge appeared to have

violated the rule of *Huffman*. Indeed, the Commonwealth suggests that the instruction on accomplice liability given by the trial court in the instant case was nearly identical to the one at issue in *Daniels*, as well as the instruction at issue in *Commonwealth v. Bennett*, 57 A.3d 1185 (Pa. 2012), and that, consequently, trial counsel was not ineffective for not challenging the instruction. Commonwealth's Brief at 46. The Commonwealth further points out that, in *Bennett*, this Court stated that it is not bound by decisions of the Third Circuit construing Pennsylvania law. *See Bennett*, 57 A.3d at 1203.

We need not engage in a protracted examination of the trial court's instructions on accomplice liability and conspiracy in this case to determine whether counsel was ineffective for failing to object to the charge. As noted above, under the *Strickland* test, a petitioner must establish that his underlying claim has arguable merit; that no reasonable basis existed for counsel's action or failure to act; and that petitioner suffered prejudice as a result of counsel's error, with prejudice measured by whether there is a reasonable probability that the result of the proceeding would have been different. *Pierce,* 786 A.2d at 213. A claim may be dismissed if it fails any one of these three prongs. *Ali,* 10 A.3d at 291.

In the instant case, we find that Housman's ineffectiveness claim fails because he cannot demonstrate that he was prejudiced by counsel's failure to object to the jury instructions. Housman confessed that he lured the victim to his trailer by lying to her, strangled her with speaker wire, and discarded her body in an abandoned car. Based on this evidence, it is inconceivable that the jury would have convicted Housman merely as an accomplice to Markman, rather than as a principal in the crime.[13] For this reason, his ineffectiveness claim fails*.*

---

[13] Indeed, while not dispositive, we note that the jury – the same jury that heard the guilt and penalty phase presentations against both Housman and Markman – found as a penalty phase mitigating factor for Markman that her participation in the killing was

### 5. Evidence as to specific cause of death

Housman next contends that his trial counsel was ineffective for failing to present evidence to establish that Markman's act of placing a gag in the victim's mouth, rather than Housman's act of wrapping speaker wire around the victim's neck, was the actual cause of the victim's death, and for failing to object to the trial court's related instruction. He further argues that the prosecution elicited and failed to correct misleading testimony regarding the specific cause of death.

Preliminarily, at trial, the medical examiner, Dr. Susan Venuti, testified that, during the autopsy of the victim, she removed, *inter alia*, the speaker wire that was tied around the victim's wrists and ankles, the cloth gag that was tied around the victim's face, and the folded piece of cloth that had been stuffed into the victim's mouth. N.T. Trial, 10/29/01, at 533-36. Dr. Venuti also noted that she had observed "a small area of pink discoloration on the decedent's neck," which "could be due either to some pressure on the neck, it could be a pressure mark, or it could simply be some discoloration due to the decompositional changes." *Id.* at 538.

Dr. Venuti testified that it was her belief "that Leslie White died from deprivation of oxygen due to airway obstruction. And the term we use is asphyxia due to suffocation by smothering." *Id.* at 545. When asked what effect "getting the hands under the ligature or wire that may have been placed around her neck" would have had on the process of asphyxiating the victim, Dr. Venuti further stated:

> Okay, you also have to remember that the decedent
> had a large gag cloth within her mouth and also another gag
> securely tied around her mouth and her neck. This action
> about her neck and her upper body may force this gag further

---

relatively minor, *Markman*, 916 A.2d at 597 n.7 (citing 42 Pa.C.S. § 9711(e)(7)), thereby highlighting Housman's predominate role.

back in her throat, push her tongue further backwards, and it will obstruct her airway.

*Id.* at 540.     She further explained:

> The term asphyxiate means lack of oxygen.  A person can be asphyxiated by having their external airways obstructed, for instance, their nose or their mouth.
>
> Another mechanism can be obstructing the decedent's airway around the neck.  The trachea can be obstructed, or the blood vessels supplying the blood to and from the brain can be obstructed, physically lying on both sides of the front of the neck.

*Id.* at 543.

Commonwealth witness Agent Stephen Lester, who was present at the autopsy of the victim, also testified at trial, where the following exchange occurred during cross-examination:

> **Markman's counsel:**  And do you recall Doctor Venuti telling you that she did not find any bruising in the neck area, but if there were, if they were there, they could have been destroyed by decomposition?
>
> **Agent Lester:**  That is correct.

N.T. Trial, 10/26/01, at 414.

On redirect, the following exchange took place:

> **District Attorney:**  There was a mark on the neck, was there not?  Let me show you Commonwealth Exhibit Number 88.  We haven't had an opportunity to view Dr. Venuti's testimony yet.
>
> **Agent Lester:**  Yes.  There was a mark on the neck, but --
>
> **District Attorney:**   I think Mr. Braught [Markman's counsel] was trying to talk about ligature marks.  You didn't find any of those, and she said it could have not been there because of decomposition?
>
> **Agent Lester:**  That is correct.

**District Attorney:** But there was this pink spot on the neck that still remained?

**Agent Lester:** Right.

*Id.* at 414-15.

Housman contends that counsel was ineffective for failing to rebut the Commonwealth's theory that Housman intended to and/or caused the victim's death by strangling her with speaker wire with two pieces of evidence. First, he notes that Dr. Venuti's autopsy report listed the cause of death as "asphyxia due to suffocation by smothering." Report of Autopsy, 1/18/01 (PCRA Hearing Exhibit 19). He further refers to a memorandum by Virginia State Police Agent S.T. Oliver, in which the agent recounts that Dr. Venuti told him, during a November 3, 2000 interview in her office, that she saw no evidence of ligature strangulation on the victim's body, and that she did not believe decomposition would have obscured ligature injuries.[14] That memorandum provided:

> Dr. Venuti advised that during the autopsy of LESLIE WHITE, she saw no petechial hemorrhages and no evidence of any ligature strangulation. This is why she ruled that WHITE died from suffocation. Dr. Venuti did not rule out that something may have blocked the carotid artery but it would have been done with something that was soft that did not leave any marks. She advised that there was a lot of decomposition on the body and this may have obscured minor injuries but does not believe that it would have obscured any ligature injuries.
>
> Dr. Venuti offer [sic] the opinion that if the victim was gagged in Pennsylvania, she probably died before getting to Virginia. She advised that she had no way of knowing for sure when or where the victim died.

Memorandum of S.T. Oliver, 11/3/00 (PCRA Hearing Exhibit 20).

---

[14] On at least one occasion, Housman refers to this memorandum as "Dr. Venuti's report to Agent Oliver." Housman's Brief at 149. The memorandum, however, was not authored by Dr. Venuti; rather, the memorandum merely set forth Agent Oliver's recollection of his interview with Dr. Venuti.

According to Housman, his counsel should have used the autopsy report and Agent Oliver's memorandum to cross-examine Dr. Venuti regarding the absence of ligature marks, and to rebut Agent Lester's testimony. Housman further suggests that the prosecutor's failure to correct Agent Lester's statement that Dr. Venuti opined that the absence of ligature marks on the victim could have been due to decomposition of the body, when the police memorandum of Agent Oliver contradicted the statement, amounts to prosecutorial misconduct. Housman's Brief at 152. Housman argues that, where there is "any reasonable likelihood" that "false testimony" offered by the prosecutor could have "affected the judgment of the jury," a new trial is required. *Id.*

The PCRA court rejected Housman's claim, concluding, *inter alia*, that trial counsel testified at the PCRA hearing that he did not cross-examine Dr. Venuti regarding her report that noted a lack of ligature marks because, "[s]trategically, I thought there was more than enough evidence based on my client's own admissions and all of the evidence he strangling [sic] the young girl and the woman puts a sock down her throat. They are both in the process of causing her death, and I didn't see the strategic advantage of getting involved in that particular issue." N.T. PCRA Hearing, 5/22/17, at 89-90. The PCRA court additionally reasoned that, even if there was no reasonable basis for trial counsel's actions, Housman failed to demonstrate prejudice.

We find no error in the PCRA court's rejection of Housman's claim. Initially, although Housman suggests that Dr. Venuti testified that it was the gag which impaired or obstructed the victim's airway, and that Dr. Venuti "repeatedly refused to conclude that the evidence showed that strangulation caused [the victim's] death," Housman's Brief at 147, Dr. Venuti nonetheless stated, as evidenced by the trial testimony quoted above, that a ligature or wire around the victim's neck could have forced the gag further back into the victim's mouth, obstructing her airway. N.T. Trial, 10/29/01, at 540.

Moreover, there was sufficient evidence that Housman's unchallenged acts constituted first-degree murder. A person is guilty of first-degree murder where the Commonwealth proves that a human being was unlawfully killed; the person accused is responsible for the killing; and the accused acted with specific intent to kill. 18 Pa.C.S. § 2502(d); *Commonwealth v. May*, 887 A.2d 750, 753 (Pa. 2005). An intentional killing is a killing by means of poison, or by laying in wait, or by any other kind of willful, deliberate and premediated killing. 18 Pa.C.S. § 2502(a). The Commonwealth may establish that a defendant intentionally killed another "solely by circumstantial evidence, and the fact finder may infer that the defendant intended to kill a victim based on the defendant's use of a deadly weapon on a vital part of the victim's body." *May*, 887 A.2d at 753.

The evidence presented at trial, including Housman's own admission that he strangled the victim with speaker wire, was sufficient to permit the jury to conclude that he intentionally, deliberately, and with premeditation participated in the murder of Leslie White. His active participation in this regard was sufficient to allow the jury to conclude that he harbored a specific intent to kill. Accordingly, even if the actual cause of the victim's death was asphyxia due to the cloth in her mouth and the gag around her face, and not the speaker wire around her neck, the evidence clearly was sufficient to convict Housman of first-degree murder. *See May*, 887 A.3d at 757 (appellant's active participation in the killing of two victims, including cutting the throat of and shooting one of the victims, was sufficient to prove that he harbored a specific intent to kill, such that, even if he did not inflict the specific injuries that caused each of the victim's deaths, he properly was convicted of first-degree murder because the evidence proved he clearly shared that intent with his accomplice); *Daniels*, 963 A.2d at 428 (rejecting claim that counsel was ineffective for failing to secure testimony of a pathologist as to specific cause of death, and emphasizing that "PCRA defense experts' opinions on the specific cause

of death say little about appellees' intention−which was a very different question. . . . [A]ppellees controlled the circumstances surrounding [the victim's] death every step of the way and . . . those circumstances fully supported a finding of an intent to kill beyond a reasonable doubt.").

Accordingly, Housman fails to demonstrate that he was prejudiced by trial counsel's failure to present evidence establishing that it was Markman's specific acts of placing a gag in and around the victim's mouth, rather than Housman's act of wrapping speaker wire around the victim's neck, that caused the victim's death.

### 6. Cumulative effect of errors

Finally, Housman argues that, in the event this Court determines he is not entitled to relief from his "conviction and sentence" based on any of the individual claims discussed above, he nonetheless is entitled to relief due to the cumulative effect of the errors at trial. Housman's Brief at 160. Housman suggests that, while this Court has "been averse to broadly-stated claims of cumulative error," we have acknowledged that multiple instances of deficient performance may warrant a prejudice assessment premised on cumulation. *Id.* Housman's discussion, however, appears to be limited to the errors he alleges occurred during the penalty phase of his trial. At any rate, in addressing Housman's guilt-phase claims above, we rejected three − that counsel was ineffective for failing to object to the admission of evidence of Housman's prior bad acts and bad character; that counsel was ineffective for failing to object to the trial court's charge on accomplice liability and conspiracy; and that counsel was ineffective for failing to cross-examine Dr. Venuti regarding the absence of ligature marks and rebut Agent Lester's testimony − on the basis that he failed to demonstrate prejudice. Upon review, we find that these three errors are insufficient to establish collective prejudice that would

entitle Housman to relief. Accordingly, for all of the reasons set forth above, we affirm the PCRA court's denial of a new trial.

## B. Penalty Phase

As noted above, the PCRA court awarded Housman a new penalty trial based on his claim that trial counsel was ineffective for failing to investigate and present certain mitigation evidence. The Commonwealth challenges that determination, while Housman maintains that the PCRA court's holding was proper. Housman further argues that the PCRA court erred in rejecting several additional bases for his claim that he is entitled to a new penalty trial. We address the issue of mitigation evidence first, as we find it to be dispositive.

With regard to the presentation of mitigation evidence,

> [i]t is well-established that capital counsel has an obligation under the Sixth Amendment to conduct a reasonably thorough investigation for mitigating evidence or to make reasonable decisions that make further investigation unnecessary. *Commonwealth v. Lesko,* 609 Pa. 128, 15 A.3d 345, 380 (2011); *Commonwealth v. Sattazahn,* 597 Pa. 648, 952 A.2d 640, 655 (2008); *Strickland v. Washington,* 466 U.S. 668, 691, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Counsel's duty encompasses pursuit of all statutory mitigators of which he is aware or reasonably should be aware, unless there is some reasonable ground not to pursue the circumstance (such as when it might open the door to harmful evidence). *Commonwealth v. Malloy,* 579 Pa. 425, 856 A.2d 767, 787 (2004). In evaluating an ineffectiveness claim alleging counsel's failure to investigate and present mitigation evidence in a capital case, we consider a number of factors, including the reasonableness of counsel's investigation, the mitigation evidence that was actually presented, and the additional or different mitigation evidence that could have been presented. *Lesko,* 15 A.3d at 380; *Commonwealth v. Collins,* 585 Pa. 45, 888 A.2d 564, 580 (2005). None of the aforementioned factors is, by itself, dispositive, because even if counsel's investigation is deemed unreasonable, the defendant is not entitled to relief unless the defendant demonstrates that prejudice resulted from counsel's conduct. *Id.*

*Commonwealth v. Brown*, 196 A.3d 130, 151 (Pa. 2018) (quoting *Commonwealth v. Tharp*, 101 A.3d 736, 772 (Pa. 2014)).

In his amended PCRA petition, Housman claimed that trial counsel was ineffective for failing to retain or request the appointment of a mitigation specialist; failing to conduct a life history mitigation investigation; failing to have a life history report prepared; failing to reasonably consult with mental health experts; and failing to present compelling available mitigation evidence to the jury. Amended PCRA Petition, 5/22/13, at 155. Specifically, Housman argued, *inter alia*, that trial counsel, despite being aware of their existence, failed to obtain his medical records from the Spartanburg Mental Health Clinic, where he received outpatient psychological and psychiatric treatment from 1989 to 1992 with psychologist Steven Hope. He further claimed that trial counsel was ineffective for, *inter alia*, failing to present during his penalty trial specific examples of the physical and emotional abuse he suffered during childhood; failing to interview and/or obtain testimony from mental experts who treated Housman as an adolescent; and failing to present evidence of his cognitive impairments.

We begin by reviewing the mitigation evidence that actually was presented at the penalty phase of Housman's trial. First, counsel presented the testimony of Robin Collins, a spiritual advisor at the prison, who testified that he feels a "special affection" for Housman, who he had been counseling for five to six months. N.T. Trial, 11/2/01, at 1287. Collins testified that Housman is always prepared for Bible study, and that Housman "fits in well" in the prison's Bible study classes. *Id.* at 1287-88. Collins indicated that he would be willing to correspond in writing with Housman in prison. *Id.* at 1289.

Counsel also presented the testimony of Housman's half-sister, Cheryl, who testified that she lived with her mother, Geneva Housman; her siblings (including

Housman); and Housman's father, Howard Housman (hereinafter, "Howard"), until she was in the sixth grade, when she told her mother that Howard had been sexually abusing her. *Id.* at 1296. At that point, she, her mother, and her siblings moved out of the house. *Id.* Housman remained with his father. Cheryl further testified that Howard was physically abusive to her older brother, Russell, and that she once observed Howard repeatedly kick Russell in his groin. *Id.* Cheryl stated that another of her older brothers, Larry, was "treated like a work horse." *Id.* She described Howard as "cruel and heartless. He is just a horrible person." *Id.* at 1298.

Finally, counsel for Housman presented the testimony of Dr. Stanley Schneider, who testified that he administered a psychological test to determine Housman's intelligence level, a personality inventory, and an interpersonal inventory to determine how he relates to others. *Id.* at 1304. Dr. Schneider stated that he also reviewed Housman's school records, as well as the psychiatric records from Housman's three-week inpatient stay at the Spartanburg Regional Medical Center in South Carolina in 1991, when he was 15 years old. *Id.* at 1305.[15] Dr. Schneider also indicated that he spoke with Housman's mother, Geneva; his father, Howard; his half-sister, Cheryl; and his half-brother, Russell. *Id.* at 1304.

Dr. Schneider testified that his "findings indicate and support basically what you heard Cheryl testify to a few minutes ago, there are a number of negative environmental factors, abandonment, loss issues. [Housman] was witness to family torture and violence." *Id.* at 1307. He further stated that, when he first met Housman, he "idolized his dad" and "didn't want anything negative said about his father"; however, Housman eventually shared that he was "abused and harshly treated by his father." *Id.* at 1309.

_____

[15] Housman was 24 years old at the time of the crime.

Dr. Schneider also noted that Housman's mother, Geneva, described Housman's father as "crazy." *Id.*

With respect to his behavior in school and his academic performance, Dr. Schneider stated that Housman:

> did not fare well there. C's, D's, E's. That is the bad news. The good news is that there is no evidence I got of any expulsions or suspensions or detentions. There is no report I have of his acting out in an aggressive way. He wasn't reported to be fighting with other kids.
> He had learning problems. There is no question about that. He has no significant work history. He can't make it in the world of work. He has had menial jobs. And in terms of his intelligence, he is average to below average. I can't find any reason in terms of his intellectual ability that he couldn't succeed in school except for this attention deficit disorder, and his inability to form positive relationships with others.

*Id.* at 1310.

When asked about the results of the psychological tests he gave Housman, Dr. Schneider explained that Housman presented as dependent, socially anxious, and self-demeaning; that he "tends to lack initiative"; that he is insecure and has dependency needs toward females; that he is fearful of being rejected by others; and that he needs reassurance, support, and direction. *Id.* at 1310-11. He also opined that Housman had attention deficit disorder, *id.* at 1310, and indicated that, if he had seen Housman when Housman was younger, he would have diagnosed him with an attachment disorder, which he defined as a "profound disturbance in social relatedness." *Id.* at 1313. Dr. Schneider reiterated that, in reviewing Housman's background, he did not find a history of acting out in a violent, hostile, aggressive, or abusive manner toward others. *Id.* at 1308, 1312. Somewhat inconsistently, however, Dr. Schneider later testified that Housman was diagnosed "as having a conduct disorder. That is because he acted out as an adolescent and resulted in his being hospitalized in Spartanburg, South Carolina." *Id.* at 1315.

In discussing Housman's hospitalization, Dr. Schneider simply stated: "He was hospitalized. He responded to that hospitalization. Unfortunately it was only about three weeks. But the records reviewed indicated that he did well for a short period of time after he was released. But there was no follow-up treatment. There was no treatment in the school." *Id.* at 1309.

Finally, Housman took the stand, and asked the jury to "allow [him] to live in prison so [he] can correspond more with Mr. Collins." *Id.* at 1282. When asked by his counsel what his position was with respect to the jury's verdict, Housman responded: "My opinion is this, I think the verdict that the ladies and gentlemen here [gave] was fair and just due to the heinous act that was done." *Id.* at 1281. The entire presentation of mitigation evidence comprises 36 pages of the transcript.

Next, we consider the mitigation evidence presented at Housman's PCRA hearing. Housman presented, *inter alia*, the testimony of Kathleen Kaib, an investigator and mitigation specialist with the Federal Public Defender's Office.[16] Kaib stated that she met with Housman numerous times, reviewed all of his medical and school records, and conducted interviews with Housman's family. Kaib explained that, when he was born, Housman lived with his mother, Geneva; his father, Howard; and his three half-siblings. Kaib noted that Housman's father, Howard, described Housman's mother Geneva as "a drunk," who was "always with different men." PCRA Hearing, 5/22/17, at 397. Kaib explained that Geneva was afraid of Howard because, in addition to physically abusing the children, he abused her as well. When Housman was nearly four years old, his half-sister Cheryl told their mother that Howard was sexually abusing her. Geneva took Housman's three half-siblings out of the house, but left Housman with his father.

---

[16] As several of the witnesses who testified at the PCRA hearing refer to or rely on the reports of other witnesses, for clarity, in some instances we discuss the testimony out of order.

Approximately one year later, Geneva kidnapped Housman and sent him and Cheryl to Virginia to live with their aunt and uncle, Geneva's sister and brother-in-law. After their uncle began to sexually abuse Cheryl, Cheryl begged her mother to send her and Housman to their maternal grandfather's house, which Geneva did. *Id.* at 189-90. Cheryl and Housman lived with their grandfather for less than a year before he had a stroke and died. *Id.* at 190. Cheryl and Housman then moved back into a home with Geneva and her paramour, where Housman stayed until he was almost ten, at which time he moved in with Howard and Howard's wife, Doris. When Housman showed up at his father's home, he apparently was filthy, lacked basic hygiene skills and manners, and his clothes were ragged. *Id.* at 397. One day when Housman was 11 years old, he came home to find Doris in the bathtub after she had attempted to commit suicide. Doris attempted suicide a second time when Housman was 14 years old. Housman remained with his father and stepmother until he was approximately 16 years old, and then returned to live with his mother and her boyfriend for another year. At age 17, Housman again returned to the home of his father and stepmother. *Id.* at 395-96.

Kaib testified that Housman reported that he had been sexually abused by his stepmother Doris's cousin's son; Doris confirmed this. *Id.* at 392-93. Kaib noted that Housman also told her that he had been physically abused by both his father and Doris, and Doris described that abuse in an affidavit, which stated, in part:

> 9. Sometimes I had to beat Bill [Housman] because of his behavior. I remember one time I was so angry at Bill that I took out a metal yardstick and I beat him til the stick was bent double. I didn't like to do it, but you have to discipline children or they won't listen and learn. That's how I learned. My daddy would beat me with hickory sticks until my legs were raw when I did something wrong.
>
> * * *
>
> 15. When Bill got to Greenville Tech he started skipping school all the time. I would drop him off but he wouldn't even go to class. When his daddy found out about him not going

> to school he got crazy angry. Howard told me to leave for a
> bit and when I returned Bill had the imprint of a six pack cooler
> where his daddy had whopped him upside the head as
> punishment. Bill was dazed and sick from the beating, but he
> didn't go back to school.

Affidavit of Doris Housman, 4/23/13, at 2-3 (PCRA Hearing Exhibit 12). Doris also indicated that, when Housman was in his late teens, he moved to Virginia to stay with an older half-brother, Lee, who reportedly "regularly beat" him, and on one occasion "beat the living slip out of [him]." *Id.* at 3.

Cheryl, who had testified at Housman's penalty trial, also testified at the PCRA hearing, but in greater detail. She testified that Housman's father, Howard, who was referred to by the nickname "Crazy" because of the "crazy" and "mean, awful things" he did to her and her siblings, had fallen off a building and had a steel plate in his head. N.T. PCRA Hearing, 5/22/17, at 178. She described that Howard made her put "half moon ice trays" in her vagina until she bled, laughed when she cried because of the pain, and poured buckets of water over her head. *Id.* at 179. She also stated that, in the winter, Howard would lock her outside while she was undressed and make her run around the outside of their trailer, and that he would hang her upside down with her head in the toilet. *Id.* She explained that, if she didn't eat her dinner, she would have to stand in the corner on one foot until it was time to go to bed. *Id.* at 179-80. According to Cheryl, the children were not allowed to eat food from the refrigerator, and Howard counted the slices of lunch meat every day; if one was missing, the children were punished. *Id.* at 180-81. Cheryl recounted the same instance that she described at Housman's penalty hearing, wherein on one occasion, Howard repeatedly kicked her brother Russell in his groin as he lay on the floor.

Cheryl stated that, initially, she did not report the abuse to her mother because Howard threatened to kill Geneva. *Id.* at 182. Cheryl also described an incident where Howard shoved her mother so hard that her mother broke her ankle and had to go to the

hospital. *Id.* at 182-83. Cheryl testified that, because her mother worked multiple jobs, Cheryl was responsible for taking care of Housman, including feeding, bathing, and dressing him, playing with him, and putting him to bed. *Id.* at 184. She also described that she attempted to run away, once when she was in first grade, and again when she was in fifth or sixth grade. *Id.* at 185-87.

Housman's mother, Geneva, also testified at the PCRA hearing, corroborating much of Cheryl's testimony. She stated that her pregnancy with Housman was unplanned, and that she returned to work approximately six weeks after giving birth to him, leaving him in the care of seven-year-old Cheryl and Howard. She also stated that Howard was so violent that she once pointed a gun at him, an occurrence that Housman witnessed. *Id.* at 208-11. Geneva stated in her affidavit that she thought Cheryl had told her when Housman's trial was being conducted, but that she never received any paperwork, never spoke with anyone, and was never visited by anyone working on his case. Affidavit of Geneva Housman, 4/3/13 (PCRA Hearing Exhibit 11), at 4.

In terms of expert testimony, Housman presented, *inter alia*, the testimony of Dr. Carol Armstrong, a neuropsychologist who evaluated Housman while he was in prison. Dr. Armstrong testified that the tests she administered to Housman revealed that he suffers from "executive dysfunction and memory impairment . . . typical of someone with very severe ADHD [(Attention-Deficit/Hyperactivity Disorder)] effects." N.T. PCRA Hearing, 5/23/17, at 238. She also stated that she found mild impairment in several areas, including multitasking, social reasoning and judgment, and practical reasoning. *Id.* at 239. Dr. Armstrong noted that she reviewed school records, medical records, reports, affidavits, notes of testimony, and other evidence that was presented at both the penalty trial and at the PCRA hearing, and she observed several red flags and risk factors for brain dysfunction and abnormal brain development. In particular, she noted the following

factors, all of which were contained in records from the Spartanburg Mental Health Clinic, where Housman received outpatient psychological and psychiatric treatment from 1989 to 1992: outpatient psychological treatment for a period of 2½ years; a referral for inpatient psychological treatment; a recommendation for family therapy, and the parents' refusal to comply with that recommendation; a recommendation for placement outside the home; a notation that Housman's mother drank a lot; a notation that Housman had significant losses and disruptions in his early life, and poor attachment as a child and in his adult life; exposure to family violence as a child, including violence with a gun; physical punishment by his father with a horse harness; and two suicide attempts by his stepmother, with whom he lived at the time. *Id.* at 267-70. Dr. Armstrong also referenced a notation in the records from the Spartanburg Mental Health Clinic that Howard had reported that he came home from work one day when Housman was a year old and found a note from Geneva indicating that she "taken off" to drink and be with other men, and that Housman did not see Geneva again until he was in kindergarten and Geneva picked him up from school and sent him with Cheryl to live with their aunt and uncle. *Id.* at 267; PCRA Hearing Exhibit 14, at 31-32.

Housman also presented the testimony of Dr. John Warren, a forensic psychologist, who was retained to review the mitigation evidence presented at Housman's sentencing hearing, as well as the records from Housman's outpatient therapy. Dr. Warren met with Housman on two occasions. Dr. Warren opined that the chaos and neglect suffered by Housman as a child likely resulted in his anxiousness, depression, impulsivity, and other problems. *Id.* at 122. Dr. Warren further noted that, although the psychologist at the Spartanburg Mental Health Clinic recommended residential care for Housman so that he would have stability in his life, Housman's father and stepmother

refused to act on that recommendation. Indeed, the physician's service notes for one of Housman's outpatient appointments read as follows:

> This boy was accompanied by his step-mother who is obviously very angry and immediately started telling about all the problems that he had caused. He has been expelled from school because of stealing a coat belonging to another child. The step-mother started telling about that and about how he has ruined their marriage. He cringed during much of this time and obviously was very uncomfortable. He spoke up a time or two saying that she is a perfectionist and he is never able to please her. She seemed to have no insight and no understanding. I told her I felt that probably they needed family therapy, but she said that all the changes were up to William, the son and that she and his father were not going to make any changes because they had already done all they were going to do. I really feel that some placement outside the home would probably be best for this child.

PCRA Hearing Exhibit 13 at 11. Dr. Warren also noted that the psychologist had recommended family therapy, but Housman's father and stepmother refused that. N.T. PCRA Hearing, 5/23/17, at 126.

Based on his review of the neuropsychological evaluation performed by Dr. Armstrong, Dr. Warren opined that Housman suffered from neurocognitive impairment; severe ADHD; Generalized Anxiety Disorder with elements of Post-Traumatic Stress Disorder; Dysthymic Disorder (chronic depression); and Developmental Reading Disorder. *Id.* at 130-35.

Finally, Dr. Lenora Petty, a child psychiatrist and the Medical Director in the Adolescent Unit at Spartanburg Regional Medical Center, where Housman received inpatient treatment in 1991, testified that, upon Housman's discharge, she recommended that he go into a residential treatment facility for long-term treatment, but that her advice was not followed by Housman's family. *Id.* at 255-56. She recounted that, upon Housman's release from inpatient treatment, she "felt that his prognosis was poor for the future." *Id.* at 256.

As noted, the PCRA court found Housman was entitled to relief on his ineffectiveness claim. In support thereof, the court opined:

> Here, the evidence at the evidentiary hearing demonstrated that Counsel's penalty phase investigation was unreasonable. Specifically, Counsel had information on readily available mental health records from the Spartanburg Mental Health Clinic. He failed to contact the Mental Health Clinic, obtain those records and investigate into them further. Counsel erroneously assumed that the records from the Mental Health Clinic would be the same as those he would obtain from the Spartanburg Regional Medical Center; he believed the two entities were [one and] the same. Despite the vast differences between the names, he chose to only look into one of the two. He only obtained medical records from the Regional Medical Center, a hospital. He never obtained the mental health records from the Mental Health Clinic. However, had he done even a cursory search of the records he did obtain from the Regional Medical Center, a search of the differently named Mental Health Clinic, he would have had observations from Doctors Hope and Petty who treated [Housman] for psychiatric disorders as an adolescent, and who had knowledge of [Housman's] records at the Mental Health Clinic. He also would have had evidence of severe mental health diagnoses. Moreover, he would have had the treating doctors' sense of [Housman's] family background/home-life at that time. At the PCRA evidentiary hearing, Trial Counsel conceded that he had no reasonable basis for not investigating into both the Regional Medical Center and the Mental Health Clinic, and that he did not have any reasonable basis for failing to obtain the complete records therefrom.

> * * *

> If Counsel would have presented the missing records at trial, the jury would have seen that [Housman's] parents abandoned him to whatever mental instability that he had when he was young and vulnerable. We believe that the argument would reasonably be that he was doomed from the start. The Spartanburg doctors' diagnosis, prescription for treatment and prognosis for the adolescent [Housman] all fell on deaf ears. [Housman's] parents felt that he was the problem and that he needed to change, but they did not offer any support to help the child change or handle his problems. They washed their hands of him. [Housman] was a child, he

could not provide for his own well-being. His parents had a duty to care for his needs, his medical and mental health, to provide for his well-being, but they refused to help him. They refused to get him necessary treatment. [Housman] fell off the map treatment-wise until the actions that led [to] this case. As an adolescent, he had a poor prognosis for the future; and that prognosis proved prophetic, all because his parents gave up on him. We believe that this insight into [Housman's] background could possibly have swayed a juror who was deciding whether death is the warranted punishment against the presumption of life. This was exacerbated by the fact that also within the Spartanburg Mental Health Clinic records were more severe diagnoses than what Doctor Schneider had reviewed and the jury had heard.

PCRA Court Opinion, 2/2/18, at 12-14 (footnote omitted). Indeed, the PCRA court characterized trial counsel's investigation into Appellant's mitigation defense as "devastatingly poor." *Id.* at 15.

Before us, the Commonwealth challenges the PCRA court's grant of a new penalty-phase trial. First, the Commonwealth contends that the PCRA court erred in failing to engage in a comparison of the evidence presented at trial and the evidence presented at the PCRA hearing, as required by *Commonwealth v. Gibson*, 951 A.2d 1110, 1121-22 (Pa. 2008) (noting that resolution of cases involving claims of ineffective assistance of counsel for failing to investigate, develop, and present mitigating evidence in capital cases requires, especially in close cases, "a developed post-conviction record accompanied by specific factual findings and legal conclusions").

The Commonwealth further asserts that the PCRA court erred in concluding that Housman's ineffectiveness claim had merit, that counsel was ineffective, and that Housman demonstrated prejudice. Specifically, the Commonwealth argues that, while Dr. Schneider did not possess Housman's patient records from the Spartanburg Mental Health Clinic, the information contained in those records was not "distinguishable" from the information contained in the records, interviews, and other documents that Dr.

Schneider did have, and which was presented at the penalty phase of trial. Commonwealth's Brief at 68. Observing that the PCRA court, in its opinion, cited to Dr. Warren's testimony at the PCRA hearing, the Commonwealth states that the "gist" of Dr. Warren's "bland testimony" was that:

> Mr. Hope and Dr. Petty were recommending residential care for [Housman]; that the family considered it but then declined to pursue it; the family therapy referenced in the notes did not appear to be true family therapy; the defendant had anxiety and apprehension; he was bullied, acted as a class clown, cried a lot, sought attention, and that the mother had alcohol issues. It is *outrageous* to say Dr. Schneider did not have this information from the Hospital records, interviews, and other documents he had; the guts of all of this supposedly "new" information was provided in his expert testimony at sentencing and through other witnesses who spoke.

*Id.* at 68 (emphasis original).

The Commonwealth also avers that Dr. Petty's testimony, to which the PCRA court also referred, tracked the reports by Dr. Petty that were contained in the records from the Spartanburg Regional Medical Center that Dr. Schneider reviewed and relied upon. *Id.* at 69. The Commonwealth contends that, on cross-examination, "Dr. Petty unwittingly affirmed every conclusion Dr. Schneider gave at trial," and suggests that Housman's "cumulative and objectively unimpressive PCRA presentation demonstrates an error below." *Id.* Based on its argument that the records from the Spartanburg Mental Health Clinic were cumulative of evidence presented at Housman's penalty trial, the Commonwealth contends Housman's underlying ineffectiveness claim lacks merit. *Id.* at 79.

The Commonwealth further maintains that the PCRA court erred in finding that trial counsel had no reasonable basis for failing to obtain Housman's medical records from the Spartanburg Mental Health Clinic, in that counsel properly relied on Dr. Schneider, who knew the records existed but "apparently deemed [them] unnecessary or

cumulative." *Id.* at 78. Finally, the Commonwealth argues that Housman failed to demonstrate prejudice because "[t]he sentencing case put on here was even more involved than that in [*Commonwealth v. Daniels*, 104 A.3d 267 (Pa. 2014)],[17] and the 'additional' mitigation did nothing to alter the concise yet thorough presentation made at trial." Commonwealth's Brief at 83.

After careful review, we find the PCRA court's determination that trial counsel's investigation into and presentation of mitigation evidence at Housman's penalty trial constituted ineffectiveness to be supported by the record. Initially, and as detailed above, the mitigation evidence presented during the penalty phase of Housman's trial pales in comparison to the mitigation evidence that was presented at his PCRA hearing. In light of the disparity between the mitigation evidence which was presented, and which could have been presented, we have little difficulty in concluding that Housman's underlying ineffectiveness claim has merit.

We next review the PCRA court's finding that there was no reasonable basis for trial counsel's failure to obtain Housman's mental health records from the Spartanburg Mental Health Clinic, and to present at trial the mitigation evidence presented at the PCRA hearing. At Housman's PCRA hearing, trial counsel Hubert Gilroy testified that he was court-appointed counsel for Housman, and that he had previously served as counsel in two capital appeals. N.T. PCRA Hearing, 5/22/17, at 5. When asked if anyone assisted

---

[17] The Commonwealth quotes the following excerpt from *Daniels*:
> Given the case in mitigation already presented to the jury emphasizing both Daniels's troubled childhood as well as positive attributes and his religious conversion, and the substantial evidence in aggravation, we do not believe that the marginal additional mitigation evidence produced at the PCRA hearing was sufficient to establish a reasonable probability that the result of the penalty phase would have been different.

*Daniels*, 104 A.3d at 310.

him in preparing the mitigation case, Attorney Gilroy stated that he had two law clerks from Dickinson School of Law working with him, and he had hired a private investigator to aid in contacting potential witnesses. Additionally, he hired Dr. Schneider from Schneider Guidance Associates "to aid in providing mitigation and testifying with respect to mitigating factors." *Id.* at 41. Attorney Gilroy stated that he hired Dr. Schneider because he "believe[d] he worked with me in other prior criminal cases. I know he worked with me in other prior civil cases." *Id.* at 43. Attorney Gilroy testified that Dr. Schneider had experience in doing evaluations in child custody cases, but that he "doubted" that he had any training in forensic psychology. *Id.* When asked if that lack of training was a concern, Attorney Gilroy replied, "It wasn't at the time. I thought he -- based upon the work he did and the interaction and the limited stuff we had to deal with, I thought he did a good, fair job." *Id.*

Attorney Gilroy explained that he was in charge of collecting records for the mitigation case, and that he spoke with some of the witnesses himself. *Id.* at 44. He stated that, after Dr. Schneider met with Housman, Dr. Schneider provided Attorney Gilroy with a list of the records he wanted to review, and Attorney Gilroy requested them. Upon receiving them, Attorney Gilroy gave them to Dr. Schneider. *Id.* Although Attorney Gilroy conceded that he had received a letter from Dr. Schneider indicating that Housman had been in outpatient therapy with psychologist Steven Hope at the Spartanburg Mental Health Clinic, counsel apparently did not attempt to obtain those records. *Id.* at 48-50. When questioned about this, Attorney Gilroy responded that he requested the records that Dr. Schneider asked him to, but that he was unaware if they had obtained all of the necessary records because he "didn't look at all of the records in the file." *Id.* at 50. When asked if, upon receiving the records he obtained at the request of Dr. Schneider, he reviewed the records himself, Attorney Gilroy stated that he could not recall. *Id.* at 55.

Attorney Gilroy explained that, for purposes of looking for "potential mitigating evidence within the records," he retained and relied on Dr. Schneider for that purpose. *Id.* at 55-56. When asked specifically if he had a strategic reason for failing to obtain the records from the Spartanburg Mental Health Clinic, Attorney Gilroy stated that he did not. *Id.* at 57.

With regard to witnesses who could have offered information or testified regarding Housman's mitigation case, Attorney Gilroy explained that he relied on Housman and Dr. Schneider "to create a witness list." *Id.* at 62. When asked if he had a strategic reason for failing to contact "potential nonfamily witnesses such as service providers whose names appeared or might have appeared in some of the records" that he received − for example Dr. Petty − to provide mitigation evidence, Attorney Gilroy replied: "Certainly not strategic. I was relying upon Dr. Schneider, him looking at the records. If he needed something else or if he needed to speak with somebody who actually treated Mr. Housman, I was relying upon him to make that determination." *Id.* at 70-71. Attorney Gilroy likewise testified that he did not have a strategic reason for failing to speak with, or have Dr. Schneider speak with Steven Hope, the psychologist who treated Housman at the Spartanburg Mental Health Clinic. *Id.* at 72.

When asked if he had considered employing a mitigation specialist, Attorney Gilroy indicated that, while he "didn't think Dr. Schneider was, quote, a mitigation specialist, closed quote," he "thought Dr. Schneider with his training could provide mitigating factors that would assist us." *Id.* at 81. When asked why he chose to use Dr. Schneider in the presentation of Housman's mitigation case, Attorney Gilroy stated:

> I like to use local people because I have jurors from Cumberland County. And if they hear the local person who they trust and give credence to, they're usually better off than -- than bringing in people from outside the area. That's assuming you get somebody locally that can do the job. I

thought he could do a -- the work we needed to have done in
this case.

*Id.* at 106.

We conclude that Attorney Gilroy had no reasonable basis for failing to obtain Housman's records from his outpatient psychotherapy at the Spartanburg Mental Health Clinic, or for failing to present the evidence that was contained in the records from the Spartanburg Regional Medical Center, which he did have. This Court recognizes that, in addressing claims that counsel was ineffective for failing to present mitigation evidence, a court may not "conflate the roles and professional obligations of experts and lawyers by demanding that counsel spot 'red flags' when the mental health expert they hired failed to do so." *Commonwealth v. Brown*, 196 A.3d 130, at 154 (Pa. 2018). Here, however, Attorney Gilroy essentially relied on Dr. Schneider, whom he knew was not a forensic psychologist or psychiatrist, not only to act as a mental health expert, but essentially to act as co-counsel. Attorney Gilroy admitted that he relied on Dr. Schneider to determine which records to request, and which witnesses to interview. He further admitted that he was not sure whether he, himself, reviewed the records that he did obtain. Even a superficial review of those records would have alerted Attorney Gilroy to the fact that there were additional records and witnesses that may have provided valuable mitigation evidence. An attorney cannot abdicate his own responsibility by hiring a mental health expert, or any other expert for that matter. While a mental health expert reasonably may be expected to spot red flags regarding certain aspects of a defendant's mental state, the expert is not an attorney, and should not be expected to make decisions as to whether to obtain records, such as school and hospital records, that are clearly relevant to a defendant's mitigation case, or to decide what witnesses to interview. Thus, we conclude that trial counsel's performance during the penalty phase of trial was not based upon a

reasonable strategy, but resulted from inattention to the mitigation evidence that was readily available.

Finally, we must determine whether the record supports the PCRA court's finding that Housman was prejudiced by trial counsel's failures. We conclude that it does. The *Strickland* test for prejudice requires a showing of a reasonable probability that the outcome of the penalty proceeding − here, the unanimous verdict of death − would have been different. *Daniels*, 104 A.3d at 297. In assessing *Strickland* prejudice,

> the question is whether the defendant has shown a reasonable probability that, had the mitigation evidence adduced at the PCRA hearing . . . been presented at the penalty phase, the outcome of the proceedings would have been different because at least one juror would have found that the mitigating circumstances collectively outweighed (or were as weighty as) the aggravating circumstances, or to convince a juror to find that the overall quality of the case in mitigation warranted a sentence of life in prison.

*Id.* at 303-04. Of course, "a penalty verdict only sufficiently supported by the record is more likely to have been affected by a deficiency in counsel than one with overwhelming record support." *Id.* at 297.

Although Dr. Schneider testified at the penalty hearing that Housman was subject to "a number of negative environmental factors, abandonment, loss issues," and witness to "family torture and violence," he did not describe any specific incidents in support of that vague statement. N.T. Trial, 11/2/01, at 1307. Dr. Schneider further testified that, while Housman's grades were poor, he did not receive any expulsions, suspensions, or detentions, and did not appear to act out aggressively. *Id.* at 1310. He described Housman as having average to below average intelligence; being dependent, insecure, socially anxious, and self-demeaning; and opined that he suffered from ADHD. Most significantly, with respect to Housman's inpatient treatment at Spartanburg Regional Medical Center, Dr. Schneider briefly stated: "He was hospitalized. He responded to that

hospitalization.  Unfortunately it was only about three weeks.  But the records reviewed indicated that he did well for a short period of time after he was released.  But there was no follow-up treatment.  There was no treatment in the school." *Id.* at 1309.

However, had trial counsel presented at trial the available evidence that was described by Kaib at the PCRA hearing, including the testimony of Housman's stepmother Doris, the jury would have learned that Housman was not just treated "harshly" by his father, but that he was physically abused by a number of people in his life, including his father, stepmother, and older half-brother.  The jury also would have had a more vivid picture of the violence and abuse that occurred in the household from the time Housman was born.

Had trial counsel reviewed Dr. Petty's notes from Housman's inpatient treatment at the Spartanburg Regional Medical Center, the jury would have been privy to a more in-depth − and, indeed, more accurate − description of Housman's emotional and behavioral history than suggested by Dr. Schneider's brief testimony.  For example, Dr. Petty's intake notes, dated May 27, 1991, provided: "[t]he precipitating events for this hospitalization are increasing irritability, increasing impulsivity, explosive behavior, increasing crying. [Housman] has had many of these behaviors for some time; however, has been having increasing problems particularly in the past week to two weeks, where he has been 'losing it' and has become explosive."  PCRA Hearing Exhibit 14 at 8.  Dr. Petty further noted that there was an altercation between Housman and his father, and that Housman had "been somewhat cruel to his dog." *Id.*  This evidence directly contradicts Dr. Schneider's testimony that Housman was not aggressive.  Moreover, the intake notes *specifically* direct referral to Housman's treatment records with Steven Hope at the Spartanburg Mental Health Clinic.

Physician notes from a psychological consultation performed by Dr. Luther Diehl on June 4, 1991, while Housman was receiving inpatient treatment, indicated, *inter alia*, that Housman appeared to be fairly anxious, socially withdrawn, and aloof, and felt alienated even from his family. *Id.* at 15. Dr. Diehl also opined that Housman had "significant learning problems"; "oppositional defiant disorder of adolescence, with anxiety features"; "developmental reading disorder"; and "mixed schizoid and paranoid personality features developing." *Id.* at 16-17. These diagnoses are more than simply "cumulative" of Dr. Schneider's testimony that Housman suffers from ADHD.

Finally, in her discharge notes, dated June 20, 1991, Dr. Petty observed that Housman: "had a history of increasing irritability, impulsivity, explosive behavior, aggression, and stealing. Many of these behaviors had been long-standing, and his stealing and explosive behavior had increased over the past few months prior to admission. He actually did hit his father prior to admission." *Id.* at 5. Dr. Petty further noted that Housman "showed tremendous amounts of anger in regards to various issues, mostly to do with his stepmother and/or biological mother. He became angry on several occasions, at one point to point where he felt he was 'going to explode'; and never really required restraining, but found it very difficult to control his anger." *Id.* Dr. Petty's notes further recounted:

> It is quite evident from his behavior in hospital that [Housman] has a great deal of difficulty maintaining his anger, that he can become highly explosive, that he does not empathize very well with others and sees nothing wrong with his behavior. He is also fairly possessive . . . and has a very negative reaction to his biological mother. When in a fit of anger, he stated he wanted to kill her. . . . [Housman] seemed to improve somewhat in hospital, albeit in a highly structured setting. He never required restraints, although coming close on several occasions. His anger was quite evident, and was directed to various staff members as well as to others. He also was noted to have a tendency to be quite manipulative in his behaviors on the ward in regards to his interactions with peers and with

staff, and as noted above, he appears to have very little concern or empathy for others other than someone that he feels he needs to protect, and he protects them very fiercely.

*Id.* at 6.

Dr. Petty indicated that Housman had signs of attention deficit order, conduct disorder, and a "developing personality disorder, most likely antisocial in nature." *Id.* at 7. Dr. Petty further opined that Housman "*presents in such a way that his future, particularly with a combination of attention deficit disorder and conduct disorder, bode poorly in terms of prognosis.*" *Id.* (emphasis added). In addition to individual therapy, Dr. Petty recommended family or group therapy to assist in controlling his anger. *Id.* Dr. Petty's prognosis casts doubt on Dr. Schneider's testimony that Housman "responded to" his hospitalization.

Additionally, had trial counsel obtained Housman's outpatient records from the Spartanburg Mental Health Clinic, the existence of which counsel testified that he was aware, *see* N.T. PCRA Hearing, 5/22/17, at 48-49, he could have presented the long-term observations and conclusions by Housman's treating psychologist, Steven Hope, that: Housman felt responsible for his stepmother's suicide attempt, PCRA Hearing Exhibit 13 at 14; Housman was greatly concerned about the relationship between his mother and his father and stepmother, fearing his mother would break up his father and his stepmother, *id.* at 15; Housman had multiple suspensions from school, *id.* at 19; Housman's stepmother was very demanding and easily frustrated with her stepson, to the extent she often refused to participate in his treatment; *id.* at 25; Housman had engaged in a pattern of stealing and fighting, *id.* at 31; Housman's father confessed to beating him with a horse harness because he suspected Housman stole it, *id.* at 39; Housman consistently felt unwanted and unloved, *id.* at 40; Housman felt guilty about his stepmother's health issues, *id.* at 46; and Housman was anxious and disappointed. *Id.* at 53.

Moreover, had counsel obtained Housman's medical records from the Spartanburg Mental Health Clinic, it is possible that he, or Dr. Schneider, would have observed the same red flags and risk factors for brain dysfunction and abnormal brain development that Dr. Armstrong saw in her review of the records. In light of all of the additional potential mitigation evidence described above, we reject the Commonwealth's characterization of Housman's PCRA evidence as "cumulative and objectively unimpressive." Commonwealth's Brief at 69.

In the instant case, the jury found a single aggravating circumstance − a killing committed while in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6) − and two mitigating circumstances − a troubled childhood and acceptance of responsibility under the catch-all mitigator, 42 Pa.C.S. § 9711(e)(8). Notably, however, Attorney Gilroy testified at Housman's PCRA hearing that he had hoped to establish additional mitigating factors under Section 9711(e)(2) (defendant was under the influence of extreme emotional disturbance), and (e)(3) (capacity of the defendant to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired), but that, after reviewing Dr. Schneider's written report, he "didn't feel Dr. Schneider was going to be able to testify on some of those areas. Although I asked him to examine them and he examined them and he said that he doesn't believe he could give an opinion favorable to our -- my client on that." N.T. PCRA Hearing, 5/22/17, at 77.

In terms of deciding whether Housman has established that there is a reasonable probability that, had the mitigation evidence produced at his PCRA hearing been presented at the penalty phase, the outcome of the proceedings would have been different because at least one juror would have found mitigating circumstances that collectively outweighed the single aggravating circumstance, we find this case to be similar to *Tharp*, *supra*. Therein, as in the instant case, the Commonwealth presented a

single aggravating circumstance; in *Tharp*, that circumstance was a victim was under the age of twelve, see 42 Pa.C.S. § 9711(d)(16). While the jury in the instant case found two mitigating circumstances, both of which fall under the catch-all mitigator, the jury in *Tharp* found two *separate* mitigators − that the defendant had no significant history of prior criminal convictions, *id.* § 9711(e)(1), and the catchall mitigator, *id.* § 9711(e)(8). *Tharp*, 101 A.3d at 745.

In concluding that the new evidence of mitigation that was presented at Tharp's PCRA hearing, which concerned her mental health, supported two additional mitigating circumstances, including that the defendant was under the influence of extreme emotional disturbance, and that the capacity of the defendant to appreciate the criminality of her conduct or conform her conduct to the requirements of law was substantially impaired − the very same mitigators Attorney Gilroy testified he would have liked to submit to the jury in the instant case − we stated:

> [T]he new evidence of mitigation presented at the PCRA hearing that related to Appellant's mental health supported two additional mitigating circumstances for which the defense did not present any evidence at trial−that Appellant was under the influence of extreme mental and emotional disturbance pursuant to Section 9711(e)(2), and that her capacity to conform her conduct to the requirements of law was substantially impaired pursuant to Section 9711(e)(3). As noted, Appellant demonstrated that at the time of trial, counsel was in possession of a pretrial competency report drafted by Dr. Moran, which indicated that Appellant had only borderline intellectual functioning, and suffered from several mental impairments. As illustrated in detail, *supra,* Appellant presented at the PCRA evidentiary hearing testimony from additional mental health experts who had reviewed Appellant's background and the extent of her criminal behavior and opined that at the time of the murder, Appellant was under the influence of extreme mental and emotional disturbance and her capacity to conform her conduct to the requirements of the law was substantially impaired.

We cannot say that had such mental health mitigating evidence been presented, the jury would still have arrived at a death verdict. *See Commonwealth v. Keaton,* 615 Pa. 675, 45 A.3d 1050, 1093 (2012) (holding that trial counsel was ineffective for failing to investigate and present evidence of neurological impairment and psychological disorders because such evidence would have supported the (e)(2), (e)(3) and (e)(8) mitigators, and there is a reasonable probability that at least one juror may have struck a different balance had such evidence been presented); *Commonwealth v. Martin,* 607 Pa. 165, 5 A.3d 177, 203–04 (2010) (holding that trial counsel was ineffective for failing to present during the penalty phase available mental health mitigation evidence supporting two additional statutory mitigators not proffered by the defense); *Commonwealth v. Zook,* 585 Pa. 11, 887 A.2d 1218, 1235 (2005) (holding that the defendant was prejudiced by trial counsel's [failure] to present available evidence of defendant's head injury and resulting brain damage that were available at the time of trial to establish two additional mitigating factors that were not presented during the penalty phase).

*Tharp*, 101 A.3d at 773-74.

We further explained in *Tharp* that the PCRA court's and the Commonwealth's reliance on our prior decisions in *Gibson* and *Lesko,* where we held that no prejudice resulted from trial counsel's failure to present mitigation evidence due to the significant amount of aggravating evidence presented, was misplaced:

> In relying on *Gibson* and *Lesko,* both the PCRA court and the Commonwealth appear to conflate the evidence of Appellant's guilt, which is overwhelming, with the evidence of statutory aggravating circumstances presented during the penalty phase, which consists of a single, albeit weighty, aggravating factor of the age of the victim.
>
> In *Gibson,* the Commonwealth presented evidence of and the jury found the statutory aggravating circumstances of multiple murders, 42 Pa.C.S. § 9711(d)(11), creating a grave risk to others, *id.* § 9711(d)(7), and commission of the murders during the perpetration of a felony, *id.* § 9711(d)(6). Likewise, in *Lesko,* the Commonwealth presented evidence of and the jury found the statutory aggravating circumstances of multiple murders, a significant history of violent felony convictions, *id.* § 9711(d)(9), and the killing of a police officer. *Id.* § 9711(d)

(1). Here, as noted, the single aggravating factor presented to the jury by stipulation was that the victim was a child under the age of twelve. *Id.* § 9711(d)(16). While this single aggravating circumstance is undoubtedly grave, we cannot conclude that it equates with the overwhelming evidence of statutory aggravating factors found by the juries in *Gibson* and *Lesko. See Commonwealth v. Malloy,* 856 A.2d at 789 (holding that the defendant was prejudiced by trial counsel's failure to present mitigating evidence, and emphasizing that the Commonwealth pursued a single aggravating circumstance). In assessing prejudice, that single aggravating circumstance must be contrasted with the two mitigating circumstances actually presented as well as the mitigating circumstances that trial counsel should have pursued. Under the circumstances presented, we conclude that there is a reasonable probability that at least one juror at Appellant's trial may have struck a different balance had such mental health mitigation evidence been presented.

*Tharp*, 101 A.3d at 774.

Herein, we likewise cannot say that, had trial counsel adequately reviewed the records from Housman's inpatient treatment at the Spartanburg Regional Medical Center, and/or had counsel obtained and reviewed, or had Dr. Schneider review, the records from Housman's outpatient treatment at the Spartanburg Mental Health Clinic, and offered at Housman's penalty trial that evidence, and the evidence derived therefrom that was presented at the PCRA hearing, the jury would still have returned a death sentence. The novel evidence presented at the PCRA hearing, including the more detailed account of Housman's abusive upbringing and his history of emotional, social, and psychological problems, as well as the serious diagnoses and poor prognoses by his treating psychiatric providers, would have supported Attorney Gilroy's submission of, and potentially at least one juror's finding of, two additional mitigating circumstances. At the very least, this same evidence may have resulted in at least one juror finding that the mitigating circumstances under the catch-all mitigator collectively outweighed, or were as weighty as, the single aggravating circumstance, such that the penalty verdict would have been different.

Accordingly, for the foregoing reasons, and mindful of the deference that must be afforded to the findings of the post-conviction court, which hears evidence and passes on the credibility of witnesses, we conclude that the record supports the PCRA court's determination that Housman's claim that trial counsel was ineffective for failing to investigate and present mitigating evidence at his penalty phase had arguable merit; that trial counsel's performance lacked a reasonable basis; and that Housman suffered prejudice as a result of counsel's ineffectiveness. Accordingly, with respect to the Commonwealth's appeal, we affirm the PCRA court's grant of a new penalty trial.

In light of our affirmance of the PCRA court's grant of a new penalty trial on the basis of trial counsel's ineffectiveness in failing to investigate and present mitigating evidence at Housman's penalty phase, we need not address Housman's remaining penalty-phase claims.[18]

Order affirmed.

Chief Justice Saylor and Justices Baer, Donohue, Dougherty, Wecht and Mundy join the opinion.

---

[18] Specifically, Housman also alleges that trial counsel was ineffective for: (1) failing to object to unconstitutional and unduly prejudicial victim impact testimony; (2) failing to properly raise and litigate his claim that his right to silence, due process, and confrontation were violated; (3) failing to seek a penalty-phase severance, thus depriving him of due process and the individualized sentencing determination to which he was entitled under the Eighth and Fourteenth Amendments to the United States Constitution; and (4) failing to object to the erroneous submission of the (d)(6) aggravating circumstance (killing committed during the perpetration of a felony) to the jury. Housman's Brief at 79-87, 87-97, 127-133, 153-160.